1

2

3

4

5

6

7

8                        IN THE UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10   EDDIE HORNER,

11              Plaintiff,                        No. CIV S-09-1564 KJM CMK

12         vs.                                    PRETRIAL ORDER

13   PANELTECH INTERNATIONAL, LLC.,
     et al.,
14
                Defendant.
15
     _____/
16

17              On July 19, 2012, the court conducted a final pretrial conference.  Todd Slaughter

18   appeared for plaintiff Eddie Horner; David McMillan appeared for defendant Paneltech

19   International.

20              After hearing, and good cause appearing, the court makes the following findings and

21   orders:

22   JURISDICTION/VENUE

23              Jurisdiction is predicated on 28 U.S.C. § 1332.  Jurisdiction and venue are not

24   contested.

25   JURY/NON-JURY

26              The parties have demanded a jury trial.

UNDISPUTED FACTS

1.  On February 12, 2007, Roseburg Forest Products employee Eddie Horner was securing a load of logs to a freight car at the Roseburg Mill in Weed, California.  To tighten the cable securing the logs, Mr. Horner employed a chain binder that was affixed to a vertical post (a log bunk) for that purpose.  The hook on one side of the chain binder was welded to the log bunk, but the weld was inadequate. The other hook was then attached to a chain secured to end of the cable.  The binder appeared to be new, as it was bright red.  As Mr. Horner applied force to the chain binder by pulling down from overhead, the weld holding the binder hook to the post broke away, causing Mr. Horner to fall to the ground, landing on his buttock and back; he claims that the injury was the result of the binder hook breaking from the weld.

2.  The railcar that Mr. Horner was working on was ITLX 54039 which is a bulkhead flat car equipped with log bunks for the purpose of shipping logs.

3.  Railcar ITLX 54039 is owned by General Electric Railcar Services Corporation (GE); defendant Paneltech leased it under a leasing agreement that made it responsible for "the maintenance and replacement of bulkhead squareness, stake pockets and stakes, carriages and chain assemblies, hitches and tie downs (as cars are equipped)."  The cars came equipped with log bunks, which were conveyed to Paneltech as part of the lease arrangement, making Paneltech the owner of the log bunks and their attachments, including the chain binders utilized for tie downs.

4.  At the time of the incident in question, Paneltech, a veneer and overlay manufacturing business in the Hoquiam/Aberdeen, Washington area, was also in the business of leasing its inventory of railcars to various railroads and shippers.

5.  In 2004, Central Oregon & Pacific Railroad (CORP) entered into a lease with Paneltech for 55 railcars.  The number of cars under the CORP lease increased by approximately 10 more cars before the incident occurred.  Under the lease, CORP agreed to "be responsible for repairs to damaged bunks, tie downs, binders and log wrappers."  Following this clause, the lease

1  provided that "all other repairs and maintenance are the responsibility of Paneltech."  The lease

2  ran from August 1, 2004 through August 2007.

3         6.  In the fall of 2006, railcar ITLX 54039 was delivered to Gunderson Northwest

4  (Gunderson), in Finley, Washington, for repairs unrelated to the present action.   Gunderson is a

5  private railcar repair facility.  Railcar ITLX 54039 was released back to Paneltech after a final

6  inspection was performed by Gunderson employee Harvey Bowden on November 9, 2006.

7         7.  After leaving the Gunderson facility, railcar ITLX 54039 was loaded and

8  unloaded on two occasions before the subject incident occurred.  The first time it was loaded at

9  Paneltech's log yard in Aberdeen, Washington on January 2, 2007.  After Paneltech loaded the

10  car, it was delivered to Roseburg at Riddle, Oregon, on January 12, 2007, where it was loaded.

11  Thereafter it returned to Aberdeen where it was loaded again and shipped on or about January

12  22, 2007.  Paneltech understood it had the responsibility to inspect and repair the log bunk,

13  binders and tie downs on its railcars when those cars came into their yard in Aberdeen.

14         8.  On February 1, 2007, the unloaded railcar left Riddle and was moved by

15  CORP to its depot in Medford, Oregon.  The car remained in Medford until February 9, 2007.

16  DISPUTED FACTUAL ISSUES

17         1.  Who welded the binder hook to railcar ITLX 54039.

18         2.  Whether the welding knowledge, experience, skill and practices used by

19  Paneltech on railcars and log bunks was inadequate, substandard and unsafe.

20         3.  Whether the practice of welding chain binder hooks to the log bunks is an

21  unsafe and substandard method of securing these tie-down attachments, and whether this

22  practice conforms with railroad industry or welding industry standards.

23         4.  Whether the design and method of attachment of the binder hooks to railcar

24  ITLX 54039 were defective and unreasonably dangerous to those using them.

25  /////

26  /////

3

5.   Whether the inspection, maintenance and repair practices of Paneltech or others concerning the securing of tie down apparatus on railcars were unreasonably inadequate and not in conformance with industry standards.

6.   Whether the subject incident was attributable to operator error on the part of plaintiff.

7.   Whether the incident in question caused the damages and losses claimed by plaintiff.

8.   Whether plaintiff was injured as the result of the incident.

9.   Whether the nature and extent of plaintiff's damages and losses is attributable to plaintiff's preexisting injuries.

10.   Whether the cost of plaintiff's medical care was reasonable and necessitated by his medical conditions.

11.   Whether plaintiff is physically disabled from returning to his prior occupation or any occupation.

12.   Whether railcar ITLX 54039 was under lease to CORP at the time of plaintiff's injuries.

13.   Whether FRA regulations and AAR Open Top Loading Rules apply to Paneltech.[1]

14.   Whether Paneltech complied with its obligations under any sublease and relevant FRA regulations and the AAR Open Top Loading Rules in inspecting the railcar.

15.   Whether CORP was comparatively negligent based upon its compliance or non compliance with the subject lease agreement, relevant FRA regulations, and the AAR Open Top Loading Rules in conducting its inspections and/or repairs of the railcar and whether that

/////

---

[1]  At the hearing, the parties agreed this is a mixed question of law and fact.

1   was a substantial factor in causing plaintiff's injuries and damages.  The parties agree the

2   resolution of this last issue is likely something to be resolved by the court rather than by the jury.

3   DISPUTED EVIDENTIARY ISSUES

4           The parties outline a number of disputed evidentiary issues.  These will be

5   resolved through motions in limine and throughout the course of trial, as necessary.  Any

6   motions in limine, limited to three pages each, should be filed no later than September 4, 2012,

7   with similarly limited oppositions due September 7, 2012.

8   SPECIAL FACTUAL INFORMATION

9           A.  Plaintiff Horner alleges he sustained injuries while securing a load of logs on

10  a freight car at the Roseburg Mill in Weed, California on February 12, 2007.  This railcar,

11  identified as ITLX 54039, is a bulkhead flat car equipped with log bunks for the purpose of

12  shipping logs.  Paneltech leased this railcar and in turn leased railcars to CORP.  This car was

13  delivered to Roseburg across CORP rail lines.

14          Mr. Horner claimed he was injured while in the process of tightening a tie down

15  to secure logs by using a chain binder, the hook end of which had been welded to the vertical

16  post of the log bunk.  As he applied force by pulling down from the overhead with all his weight,

17  the weld between the hook and the vertical post failed, causing him to fall hard to the ground.

18  Plaintiff claims that a subsequent inspection of the weld showed it did not have enough strength

19  to sustain the loads applied during the loading and shipping operations.

20          Plaintiff brought this action against Paneltech on theories of general negligence

21  and product liability.  Plaintiff asserts that Paneltech used faulty and defective welding

22  techniques to attach the binder to the vertical post, that its employees were unqualified and

23  inadequately trained to perform such welds, that Paneltech's design and application of the

24  method of securing the binder to the post were inadequate, defective and unsafe, that Paneltech

25  did not perform adequate inspections of its railcars to assure the safety of the log bunks and tie

26  down accessories, that as a commercial lessor of the railcar Paneltech is strictly liable in product

5

1   liability for defective accessories on its railcars, and that but for Paneltech's negligent inspection,

2   maintenance, repair and operating practices, plaintiff would not have been injured.

3          Plaintiff relies not only on general standards of industrial and railroad operations,

4   but also on the rules and standards of the Association of American Railroads (AAR) and the

5   American Welding Society, which he claims were not followed, including AAR Rules 14.13.1

6   and 14.13 and Rule 82.A.2 of the AAR Field Manual, all of which govern welding and the

7   strength of any attachment devices.

8          Paneltech denies that its employees performed the weld that broke on February

9   12, 2007, but argues instead that under its lease CORP was responsible for ensuring that the log

10  bunks and tie down accessories were repaired and that had CORP undertaken a reasonable

11  inspection, it would have found that the chain binders were damaged and in need of repair.

12  Paneltech also contends that it adequately inspects its railcars and that someone else could have

13  made the subject weld after the car left Paneltech's yard.  It further maintains that plaintiff

14  Horner used a "cheater bar" to extend the handle of the binder against manufacturer

15  recommendations and that had he not done so, the weld might have been sufficient.

16         Paneltech contends that the AAR Rules do not apply to it because it is not an

17  AAR subscriber and that FRA regulations do not apply because it is not a railroad operating in

18  the United States.  It also argues that it cannot be held liable under a theory of strict product

19  liability.

20         Paneltech contends that CORP is comparatively negligent because Paneltech's

21  railcar lease with CORP obligated CORP to ensure that the log bunks and tie down accessories

22  were repaired and that had CORP conducted a reasonable inspection, it would have determined

23  that the chain binder was "damaged" and in need of replacement.

24         Plaintiff counters that Paneltech's comparative negligence claim against CORP is

25  preempted by the Federal Rail Safety Act (FRA) because CORP complied with FRA

26  /////

6

regulations regarding railcar inspections.  He also alleges that CORP complied with its own internal policies and procedures regarding inspections.

       B.  Plaintiff was 55 years old at the time of the incident and will be 59 years old at the time of trial. He contends he suffered injury to his neck, which exacerbated a pre-existing left posterolateral disc protrusion at C5-C6.  He further contends that following the incident, he developed chronic neck and shoulder pain, radiating pain and numbness into his arms and hands, as well as chronic pain into his left pain and rib.  He also claims to have developed increased tinnitus in his ears and a migraine-associated vertigo, causing disequilibrium and headaches.

       In July 2008, he underwent a cervical discectomy and fusion at C5-C6.  Although the procedure initially relieved his pain, it did not take and his pain returned.  In January 2010, plaintiff had corrective surgery to address the failed fusion, which involved a two-level fusion at C4-C6, employing hardware.  Although the surgery was successful, plaintiff continues to have chronic and disabling neck pain, upper back pain, mid-thoracic pain, recurrent headaches and dizziness.

       To date plaintiff's medical bills total $97,997.55.  Future medical expenses are estimated at less than $10,000.

       At the time of the incident, plaintiff had worked at Roseburg Forest Products for 34 years and was a Yard Lead Man, earning $52,535 a year.  Although plaintiff returned to light duty after the injury, he was excused from work for six weeks following the first surgery and has been unable to work at Roseburg since July 2009.

       His past and future wage and benefits losses have been calculated as $693,185.  Coupled with the past and future medical expenses, the total economic loss is $801,182.55.

RELIEF SOUGHT

       Plaintiff seeks past and future economic and noneconomic damages.

/////

/////

7

<u>POINTS OF LAW</u>

The parties shall succinctly brief the elements, standards and burdens of proof applicable to the claims presented by plaintiff under the applicable constitutional amendment, statutes and/or regulations.  Trial briefs shall be filed with this court no later than September 4, 2012.

<u>ABANDONED ISSUES</u>

For plaintiff:  Plaintiff and CORP settled and this court found the settlement to be in good faith, barring Paneltech from seeking contribution.

For defendant Paneltech: the following affirmative defenses have been abandoned: first, failure to state a claim; second, statute of limitations; third, unclean hands; fourth, estoppel; ninth, consent; tenth, assumption of risk.

For third party claimant Paneltech: first cause of action, express written indemnity.

For third-party cross-defendant Paneltech:  First, failure to state a claim; second, statute of limitations; third, unclean hands; fourth, estoppel; fifth, failure to mitigate; ninth, consent; tenth, assumption of risk.

<u>WITNESSES</u>

Plaintiff's witnesses are identified in ECF No. 105, incorporated herein by reference.  Defendant's witnesses are identified on ECF No. 103, incorporated herein by reference.

Each party may call any witnesses designated by the other.

A.    The court will not permit any other witness to testify unless:

(1) The party offering the witness demonstrates that the witness is for the purpose of rebutting evidence that could not be reasonably anticipated at the pretrial conference, or

/////

1       (2) The witness was discovered after the pretrial conference and the

2       proffering party makes the showing required in "B," below.

3     B.   Upon the post pretrial discovery of witnesses, the party shall promptly

4 inform the court and opposing parties of the existence of the unlisted witnesses so that the court

5 may consider at trial whether the witnesses shall be permitted to testify.  The witnesses will not

6 be permitted unless:

7       (1) The witnesses could not reasonably have been discovered prior to

8       pretrial;

9       (2) The court and the opposing party were promptly notified upon

10      discovery of the witnesses;

11      (3) If time permitted, the party proffered the witnesses for deposition;

12      (4) If time did not permit, a reasonable summary of the witnesses'

13      testimony was provided to the opposing party.

14 EXHIBITS, SCHEDULES AND SUMMARIES

15    Plaintiff's exhibits are identified in ECF No. 104, incorporated herein by

16 reference.  At trial, plaintiff's exhibits shall be listed numerically.  Plaintiff may be offering two

17 tangible items into evidence: a portion of a log bunk with chain binder attached and a red chain

18 binder produced by defendant Paneltech during discovery.  Plaintiff will take possession of these

19 exhibits after trial pending any appeal.

20    Defendant's exhibits are identified in ECF No. 103, incorporated herein by

21 reference.  At trial, defendant's exhibits shall be listed alphabetically.

22    The court encourages the parties to generate a joint exhibit list to the extent

23 possible.  Joint Exhibits shall be identified as JX and listed numerically, e.g., JX-1, JX-2.

24    All exhibits must be premarked.

25 /////

26 /////

1    The parties must prepare exhibit binders for use by the court at trial, with a side

2 tab identifying each exhibit in accordance with the specifications above.  Each binder shall have

3 an identification label on the front and spine.

4    The parties must exchange exhibits no later than twenty-eight days before trial.

5 Any objections to exhibits are due no later than fourteen days before trial.

6    A.  The court will not admit exhibits other than those identified on the exhibit lists

7 referenced above unless:

8    1.  The party proffering the exhibit demonstrates that the exhibit is for the

9    purpose of rebutting evidence that could not have been reasonably

10    anticipated, or

11    2.  The exhibit was discovered after the issuance of this order and the

12    proffering party makes the showing required in Paragraph "B," below.

13    B.  Upon the post pretrial discovery of exhibits, the parties shall promptly inform

14 the court and opposing party of the existence of such exhibits so that the court may consider at

15 trial their admissibility. The exhibits will not be received unless the proffering party

16 demonstrates:

17    1.  The exhibits could not reasonably have been discovered earlier;

18    2.  The court and the opposing party were promptly informed of their

19    existence; and

20    3.  The proffering party forwarded a copy of the exhibit(s) (if physically

21    possible) to the opposing party.  If the exhibit(s) may not be copied the

22    proffering party must show that he has made the exhibit(s) reasonably

23    available for inspection by the opposing party.

24 <u>DISCOVERY DOCUMENTS</u>

25    Counsel must lodge the sealed original copy of any deposition to be used at trial

26 with the Clerk of the Court and provide a copy for the court's use no later than September 4,

2012.  Plaintiff's list of discovery documents is included in ECF No. 106; defendant's in ECF No. 103.   Defendant's supplemental list of discovery documents for trial is included in ECF No. 110.

FURTHER DISCOVERY OR MOTIONS

The parties will arrange for the depositions of Michael Graham, defendant's vocational rehabilitation expert, and of Mike Rice, a percipient witness.

A discovery dispute exists between the parties concerning purported surveillance tapes taken of the plaintiff.  Plaintiff indicates he was never made aware of these tapes during discovery and has demanded a copy of them together with the investigator's report.  Should this dispute not be resolved before trial, the court will address it as appropriate before or during trial.

STIPULATIONS

The parties stipulate that all medical bills and records exchanged in discovery are authentic and that the records qualify as business records.  There is no stipulation concerning the admissibility of the contents of the records.

AMENDMENTS/DISMISSALS

None contemplated.

SETTLEMENT

The parties participated in a private mediation on August 11, 2011; this resulted in the settlement between plaintiff and CORP, which the court found to be in good faith.

Horner and Paneltech attempted another mediation on March 16, 2012.

The case is set for settlement on August 30, 2012 at 10:00 a.m. before the Honorable Dale A. Drozd.

MOTIONS IN LIMINE

As noted above, the court will entertain motions in limine concerning the parties' evidentiary issues on the first day of trial.

////

JOINT STATEMENT OF THE CASE

The parties are directed to file a joint statement of the case the Friday before the beginning of trial.

SEPARATE TRIAL OF ISSUES

Not applicable.

IMPARTIAL EXPERTS/LIMITATION OF EXPERTS

Not applicable.

ATTORNEYS' FEES

There is no statutory basis for attorneys' fees.

ESTIMATED TIME OF TRIAL/TRIAL DATE

Jury trial is set for September 10, 2012 at 9:00 a.m. in Courtroom Three before the Honorable Kimberly J. Mueller.  Trial is anticipated to last six to eight days.  The parties are directed to Judge Mueller's trial schedule outlined at the "other calendaring information" link above her calendar on the court's website.

PROPOSED JURY VOIR DIRE AND PROPOSED JURY INSTRUCTIONS

The court directs counsel to meet and confer in an attempt to generate a joint set of jury instructions and verdicts.  The parties shall file any such joint set of instructions by September 4, 2012, identified as "Jury Instructions and Verdicts Without Objection."  To the extent the parties are unable to agree on all or some instructions and verdicts their respective proposed instructions also are due by September 4, 2012.

Counsel shall e-mail a copy of all proposed jury instructions and verdicts, whether agreed or disputed, as a Word Perfect (preferred) or Word attachment to kjmorders@caed.uscourts.gov no later than fourteen days before trial; all blanks in form instructions should be completed and all brackets removed.

Objections to proposed jury instructions must be filed seven days before trial; each objection shall identify the challenged instruction and shall provide a concise explanation

1    of the basis for the objection along with citation of authority.  When applicable, the objecting

2    party shall submit an alternative proposed instruction on the issue or identify which of his or her

3    own proposed instructions covers the subject.

4            The parties shall file any proposed voir dire by September 4, 2012.  Each party

5    will be limited to ten minutes of jury voir dire.

6    MISCELLANEOUS

7            On or about March 7, 2012, defendant Paneltech filed for bankruptcy protection

8    under Chapter 11.  Plaintiff was given notice of the bankruptcy on April 5, 2012.  Plaintiff

9    obtained relief from the stay on May 22, 2012.  This relief was granted on the condition that

10   plaintiff agreed to limit recovery to available insurance proceeds.  Plaintiff was informed that the

11   primary policy has one million dollars ($1,000,000) in coverage, and that there is excess

12   insurance with a limit of five million dollars ($5,000,000).

13   OBJECTIONS TO PRETRIAL ORDER

14           Each party is granted fourteen days from the date of this order to file objections to

15   the same.  If no objections are filed, the order will become final without further order of this

16   court.

17   DATED:  August 21, 2012.

18

19   _____

20                 UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26